**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

UNITED STATES OF AMERICA,

      **Plaintiff**

      v.

PUERTO RICO DEPARTMENT OF
SPORTS AND RECREATION and RAY
QUIÑONES AS SECRETARY OF SPORTS
AND RECREATION, in his official
capacity,

      **Defendants**

          **CIVIL NO. 21-1248 (RAM)**

<u>**OPINION AND ORDER**</u>

RAÚL M. ARIAS-MARXUACH, United States District Judge

      Pending before the Court is Defendants Department of Sports and Recreation ("DSR" or the "Department") and Ray Quiñones's ("Quiñones") (collectively, "Defendants") *Motion to Dismiss* (the "*Motion*") at Docket No. 21. For the reasons detailed below, the *Motion* is **GRANTED**.

      **I.   FACTUAL BACKGROUND**[1]

      The Puerto Rico Department of Education ("PRDOE") is responsible for managing the Title I funds assigned to Puerto Rico by the United States Department of Education ("USDE"). (Docket No.

---

[1] The Court's factual recitation is taken from the allegations in the *Amended Complaint*, the content of which must be accepted as true at this stage of the proceedings. *See* <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012).

6 ¶ 17).[2] To facilitate this process, the PRDOE has a Unit for the Adjudication of Funds and Work Plans that evaluates and decides which projects receive funding. Id. ¶ 19. Parties applying for funding submit work plans to the PRDOE's "UPT System," a web-based platform utilized to organize funding requests. Id.

On or about April 2, 2013, the PRDOE received and approved a work plan that was submitted via the UPT System titled "Generacion Saludable: Un Proyecto para el Desarollo de destrezas academicas y estilos de vida sanos" (hereinafter the "Healthy Generation Project"). Id. ¶ 20. The PRDOE then contracted with the DSR to carry out the Healthy Generation Project. Id. ¶ 21. The contract was titled Covenant 2014-AF0247 (also referred to as the "Covenant"). Id. Covenant 2014-AF0247, which provided the DSR with $3,998,700, was financed with Title I funds and included a clause forbidding the DSR from subcontracting the services stipulated in the Covenant. Id. ¶ 24. To this end, the DSR represented in the Covenant that it was able to perform the activities outlined therein. Id. ¶ 26. Further, the Covenant provided that, should the DSR choose to contract personnel to assist in carrying out the services (as opposed to subcontracting the services entirely), it was required to follow the proposal and bidding process outlined

---

[2] Title I funds are "funds received by the PRDOE under Title I, Part A [of the] Elementary and Secondary Education Act of 1965, as amended." Id. ¶ 3. These funds "provide financial assistance to local education agencies and schools with high numbers or high percentages of children from low-income families to help ensure that all children meet challenging academic standards." Id.

in the "Guide for the Selection of Professional Services Funded with Federal Funds." Id. ¶ 25.

Meanwhile, on or about March 13, 2014, the DSR contracted with Rosso Group, Inc. ("Rosso"), a for-profit corporation, to develop a project titled "Aprendo Saludable" Id. ¶ 22. The DSR paid Rosso $3,198,960. Id. The DSR did not engage in any competitive bidding process before selecting Rosso for this project. Id. The United States of America (the "Government") alleges that the services outlined in the DSR-Rosso contract were the exact same services DSR received funding for from the PRDOE pursuant to the Covenant. Id. ¶ 23.

Thus, according to the Government, the DSR engaged in a fraudulent scheme to subcontract the Healthy Generation Project to Rosso for a profit and hide that fact through various false proposals, bids, and requests for payment. Id. ¶¶ 23; 27-32. In its own words, the Government contends the DSR "defrauded the United States when it made material and fraudulent misrepresentations and omissions to obtain federal funds" and "falsely certified that it performed the contract and knowingly submitted false certifications for payment through a fraudulent scheme to obtain federal funds." Id. ¶ 4.

## II.   PROCEDURAL BACKGROUND

The Government filed the operative complaint in this action (the "*Amended Complaint*") on July 13, 2021, alleging violations of

the False Claims Act ("FCA" or the "Act") against the Commonwealth of Puerto Rico ("the Commonwealth"), the DSR, and Quiñones, the Secretary of the DSR, in his official capacity. (Docket No. 6). The Commonwealth filed a *Motion to Dismiss* on October 7, 2021. (Docket No. 15). After reviewing the Commonwealth's arguments, the Government requested that the Court dismiss the Commonwealth from this action but allow the Government to continue pursuing its claims against Defendants. (Docket No. 18 at 1). The Court granted this request. (Docket No. 40).

On December 15, 2021, Defendants filed the pending *Motion*. (Docket No. 21).[3] The Government filed an *Opposition*, Defendants followed with a *Reply*, and the Government thereafter filed a *Sur-Reply*. (Docket Nos. 26; 33; 34).

### III.   MOTION TO DISMISS STANDARD

When ruling on a Rule 12(b)(6) motion, "[t]he sole inquiry . . . is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 7 (1st Cir. 2011). The Court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash

---

[3] The Court denied the Government's request for entry of default (Docket No. 18) and granted Defendants' requests for extensions of time in light of budget restraints at the DSR and other related issues that precluded Defendants from responding in a timely manner. (Docket Nos. 19; 20; 41).

cause-of-action elements." <u>Schatz v. Republican State Leadership Comm.</u>, 669 F.3d 50, 55 (1st Cir. 2012) (citations omitted). Then, the Court takes "the complaint's well-pled (*i.e.*, non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor," to determine "if they plausibly narrate a claim for relief." <u>Id.</u> (citations omitted). The analysis for a Rule 12(b)(1) motion "is essentially the same as a Rule 12(b)(6) analysis: we accept the well-pleaded facts alleged in the complaint as true and ask whether the plaintiff has stated a plausible claim that the court has subject matter jurisdiction." <u>Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.</u>, 4 F.4th 63, 69 (1st Cir. 2021) (citation omitted). "If a Rule 12(b)(1) motion contests factual allegations of the complaint, the court must engage in judicial factfinding to resolve the merits of the jurisdictional claim." <u>Id.</u>

## IV.   ANALYSIS

### A. The United States May Not Bring a FCA Action Against a State Agency

The FCA subjects to liability "any person" who, *inter alia*, submits a false claim to the government "for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B). The Act authorizes the government to bring a civil action against anyone who violates the statute. <u>Id.</u>

§ 3730(a). Alternatively, a private party, known as a "relator," may bring a *qui tam* action in the name of the government. Id. § 3730(b)(1); *see also* Borzilleri v. Bayer Healthcare Pharms., Inc., 24 F.4th 32, 36 (1st Cir. 2022).

While the statute itself does not define "person," the Supreme Court has held that "'person' does not include the sovereign." Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens, 529 U.S. 765, 780 (2000). Therefore, states are not subject to liability in actions brought by private parties under the FCA. Id. at 787-88. By the same token, a state agency cannot be sued under the FCA. Id.[4] "Though the Court did not explain how to determine whether an entity is a state agency for FCA purposes," courts in the First Circuit use "the same test as that used for determining whether an entity is an arm of the state entitled to share in Eleventh Amendment immunity." United States v. Univ. of Massachusetts, Worcester, 812 F.3d 35, 39 (1st Cir. 2016).

Importantly, however, the Stevens case involved a FCA claim brought by a private party. It did not explicitly address the situation at bar where the Government is pursuing a FCA claim against a potential state entity. In her concurring opinion, Justice Ginsburg noted this potential gap in the Stevens holding, writing, "I read the Court's decision to leave open the question

---

[4] However, the Supreme Court has since held that local governments are "persons" subject to suit under the FCA. *See* Cook County, Ill. v. United States ex rel. Chandler, 538 U.S. 119 (2003).

whether the word 'person' encompasses States when the United States itself sues under the False Claims Act." <u>Stevens</u>, 529 U.S. at 789 (Ginsburg, J., concurring).

Courts have disagreed as to the scope of the <u>Stevens</u> decision. Some courts have determined that the United States should be treated the same as private parties when pursuing FCA claims, and thus "the United States may not bring an FCA action against an arm of the state[.]" <u>United States ex rel. Doughty v. Oregon Health & Scis. Univ.</u>, 2017 WL 1364208, at *5 (D. Or. 2017); *see also* <u>Donald v. Univ. of California Bd. of Regents</u>, 329 F.3d 1040, 1042 n.3 (9th Cir. 2003) ("Nothing in the Court's [<u>Stevens</u>] opinion purports to limit its scope solely to *qui tam* suits brought by private parties."); <u>United States v. Menominee Tribal Enterprises</u>, 601 F. Supp. 2d 1061, 1069 (E.D. Wis. 2009). Other courts have conversely held "that in an action by the United States against a state, claiming a violation of the False Claims Act, the state is a 'person.'" <u>United States v. Univ. Hosp. at Stony Brook</u>, 2001 WL 1548797, at *3 (E.D.N.Y. 2001). The parties did not cite, and this Court did not find, any binding authority on this issue.

Having reviewed the diverging case law on the issue, the Court determines that the <u>Stevens</u> holding applies in full force to FCA actions brought by the Government.[5] As an initial matter, nothing

---

[5] The Government does not appear to challenge this point in its briefing. In fact, the Commonwealth relied heavily on <u>Stevens</u> in its *Motion to Dismiss* and, after reviewing that motion, the Government quickly moved to dismiss its claims

in the Supreme Court's analysis in Stevens suggests that the outcome would have differed had the United States intervened in the matter or brought the suit on its own. The Court simply analyzed the statutory scheme and history of the FCA and applied its "longstanding interpretive presumption that 'person' does not include the sovereign." Stevens, 529 U.S. at 780-87. While Justice Ginsburg's concurrence, quoted in part above, suggests the Stevens holding is limited to suits by private parties, that concurrence is not the opinion of the majority, and this Court "is required to follow the majority opinion in Stevens[.]" Doughty, 2017 WL 1364208, at *4.

Additionally, the fundamental and peculiar nature of *qui tam* actions also supports this conclusion. As noted above, the FCA allows private parties to bring a *qui tam* action "for the person and for the United States government in the name of the government." Borzilleri, 24 F.4th at 36 (quoting 31 U.S.C. § 3730(b)(1)). Therefore, "private litigants in FCA lawsuits are actually acting on behalf of the United States, and the United States is represented whether it is the originator of the lawsuit of just a bystander." Menominee Tribal Enterprises, 601 F. Supp. 2d at 1069. The United States is thus the real party in interest regardless of whether a private citizen or the government is the

---

against the Commonwealth, therefore implicitly conceding the validity of this argument. (Docket Nos. 15; 18).

plaintiff. By this logic, the Stevens holding should not be read to apply solely to FCA actions brought by private parties.

For the above stated reasons, and pursuant to current Supreme Court precedent, the Court finds that the government **may not** bring a FCA claim against a state or state agency.

**B. The Commonwealth of Puerto Rico is a State for FCA Purposes**

While Puerto Rico is not one of the fifty states, it "is generally considered a state" "for legal purposes." Perez-Rodriguez v. Camden Cnty. Sheriff's Dep't, 2007 WL 9761316, at *5 n.2 (D.P.R. 2007) (collecting cases). Particularly relevant here is the First Circuit's longstanding treatment of Puerto Rico as a state for Eleventh Amendment purposes. *See* Centro de Periodismo Investigativo, Inc. v. Fin. Oversight & Mgmt. Bd. for Puerto Rico, 2022 WL 1553454, at *9 (1st Cir. 2022) ("[T]his court has long treated Puerto Rico like a state for Eleventh Amendment purposes, including recently."). As the First Circuit has explained, Puerto Rico's "government has always been considered a sovereign entity entitled to immunity from suit without consent." Maysonet-Robles v. Cabrero, 323 F.3d 43, 53 (1st Cir. 2003) (citing Porto Rico v. Rosaly Y Castillo, 227 U.S. 270, 273 (1913)). Considering this legal backdrop, the Court holds that Puerto Rico is a state for FCA purposes. It thus follows that, under the current framework, parties, including the government, may not bring FCA claims against the Commonwealth or its agencies.

### C. **The DSR is a State Agency**

Having determined these threshold issues, the Court turns to whether the DSR is a state agency. As noted above, in conducting this inquiry, the First Circuit employs the same test used to determine whether an entity is an arm of the state for Eleventh Amendment purposes. *See* Univ. of Massachusetts, Worcester, 812 F.3d at 39.[6] First, the Court must "determine if the state has indicated an intention – either explicitly by statute or implicitly through the structure of the entity – that the entity share the state's sovereign immunity." Id. (internal quotation marks and citation omitted). "In the absence of an explicit statement, an analysis of the entity's structure requires a wide-ranging survey of the entity's relationship with the state." Id.

The party claiming sovereign status bears the burden of showing it is an arm of the state. Id. at 40 (citations omitted). Courts consider a variety of factors when conducting this analysis, including "the degree of state control over the entity, the way in which the entity is described and treated by its enabling legislation and other state statutes, how state courts have viewed the entity, the functions performed by the entity, and whether the entity is separately incorporated." Id. If this structural

---

[6] While the First Circuit limited that holding to "actions brought by private parties," pursuant to this Court's discussion in Section IV.A. of this Opinion regarding the reasons FCA claims brought by private parties are to be treated the same as claims brought by the government, the Court will apply the test outlined in United States v. Univ. of Massachusetts, Worcester.

analysis is conclusive, the inquiry ends. Id. If not, courts proceed to the second step and "consider whether the state's treasury would be at risk in the event of an adverse judgment." Id. (internal quotation marks and citation omitted). As explained below, the Court finds the DSR is unequivocally a state agency.

First, there is no question that the DSR was created to perform a governmental function. The Department's Organic Act (the "Organic Act") was written to carry out the purpose of the "Legislature of the Commonwealth of Puerto Rico to establish public policy, elevating sports and recreation to the category of a right, and to grant the [DSR] the powers necessary to foster, regulate, and oversee all aspects and modalities of these areas." Statement of Purpose, Puerto Rico Law No. 8 of January 2004, as amended, P.R. Laws Ann. tit. 3 §§ 444 et seq.[7] To that end, the DSR has broad governmental powers, including the authority to: (a) approve, amend, or appeal regulations; (b) issue administrative orders; and (c) issue resolutions, licenses, certifications, authorizations, endorsements, and permits. P.R. Laws Ann. tit. 3 § 444c(b). It is also worth noting that the basis of the Government's claim is that the DSR violated the FCA while working with the PRDOE to oversee and carry out the Healthy Generation Project, which is clearly a government function. (Docket No. 6).

---

[7] At the Court's request, Defendants submitted a certified translation of the Organic Act. (Docket Nos. 42; 43).

Second, the state exerts significant control over the DSR's governance and funding. The Secretary of the Department of Sports and Recreation, who runs the DSR, is appointed by the Governor, with the advice and consent of the Senate. P.R. Laws Ann. tit. 3 § 444a. The Organic Act created three special funds to house the Department's money, each of which is controlled or overseen in some capacity by the Commonwealth. Id. § 444e. First, the Special Fund of the Sports and Recreation Department is controlled directly by the Secretary of the Treasury, not the DSR. Id. § 444e(a).[8] The High-Performance Athlete Trainer Fund is kept separate from the other funds of the Government of the Commonwealth of Puerto Rico but is supplied in part with appropriations provided by the Legislature. Id. § 444e(b). Finally, the Special Fund for Sports Massification in Puerto Rico, while controlled directly by the Secretary of the DSR and a Board of Directors, is not separate from the Commonwealth. Instead, five of the six members of that Board are appointed by the Governor, and two of those members require the advice and consent of the Senate. Id. §§ 444d-1, 444e(c). That leaves only one member of the DSR's governing body that is not appointed by the state, which is probative of arm-of-the-state status. Additionally, this fund is also supplied, in part, by appropriations by the Legislature and is kept on the books

---

[8] Curiously, this provision of the statute was not included in Defendants' certified translation. (Docket No. 43-1 at 9).

of the Department of the Treasury of Puerto Rico. Id. § 444e(c).

Third, the Organic Act enumerates only three duties of the Secretary of the DSR, two of which directly weigh in favor of arm-of-the-state status. The Secretary must advise "the Governor, the Legislature, and the municipal governments in the formulation of a public policy to be followed on sports and recreation and public and private camps according to the provisions of this Act." Id. § 444c(a)(1). Additionally, they must submit "a report on the work performed to the Governor and the Legislature at the end of each fiscal year." Id. § 444c(a)(3). These functions further indicate the DSR's connection with the government of Puerto Rico and the extent of the Commonwealth's oversight of its work.

Fourth, the DSR needs explicit state approval before it may carry out many of its functions. For example, the Secretary cannot sell at public auction the lands ceded to the DSR for recreational use or acquire plots of land that may be developed as recreational or sports facilities without prior authorization from the Puerto Rico Planning Board. Id. § 444g(a). Additionally, the DSR cannot unilaterally issue funds to any organizations under its jurisdiction. Instead, it may only recommend to the Puerto Rico Legislature that such organizations be funded by the Treasury of the Commonwealth. Id. § 444f.

Fifth, the DSR is not separately incorporated. The Department was originally "created as an executive department of the

Commonwealth." Melendez v. Com. of Puerto Rico Pub. Recreation & Parks Admin., 845 F. Supp. 45, 49 (D.P.R. 1994) (citing P.R. Laws Ann. tit. 3 § 442b (1980)). Despite its subsequent restructuring, it has expressly retained "its legal personality." P.R. Laws Ann. tit. 3 § 444a. While the Government contends this "legal personality" supports the conclusion that the DSR is not an arm of the state, the argument misses the mark. (Docket No. 34 at 4). The language of Section 444a evinces a clear intent by the Legislature of Puerto Rico to maintain the status quo in allowing the DSR to *retain* its juridical personality – *i.e.*, the DSR has kept the personality it has always had. As prior cases from this District have recognized, the DSR's longstanding status as an executive department of the Commonwealth supports the conclusion it is an arm of the state. *See, e.g.*, Melendez, 845 F. Supp. at 51. Most glaringly, the Government fails to explain how the DSR's retention of its previous legal personality supports the conclusion that the DSR is no longer an arm of the Commonwealth.

Finally, despite the Government's contention to the contrary, none of the DSR Secretary's enumerated powers alter this analysis. The Government specifically cites Section 444c(b)(10) of the Organic Act in arguing the DSR is not an arm of the state. (Docket No. 26 at 3). Section 444c(b)(10) permits the DSR Secretary:

> [T]o appear before federal, state and international courts to enforce compliance with the purposes of this Act, as well as its

> regulations, orders, and resolutions, and also
> in any procedure or matter that affects or
> that may affect the purposes of this Act, the
> regulations that the Department issues
> pursuant thereto, or the interests of the
> public regarding sports and recreation,
> without prejudice to the representative
> capacity of the Olympic Committee and of its
> federations.

P.R. Laws Ann. tit. 3 § 444c(b)(10). However, given the multitude
of reasons discussed above that favor arm-of-the-state status, the
Court does not see how a provision which authorizes the DSR
Secretary to affirmatively enforce compliance with DSR rules and
regulations separates it in any way from the state.

       As the Court finds this structural analysis conclusive, it
need not "consider whether the state's treasury would be at risk
in the event of an adverse judgment." Univ. of Massachusetts,
Worcester, 812 F.3d at 40.[9] Simply put, the Court agrees with other
decisions from this District that have held "the Department of
Sports and Recreation is, without serious question, an arm of the
Commonwealth[.]" Pagan v. Puerto Rico, 991 F. Supp. 2d 343, 346-
47 (D.P.R. 2014). In fact, the Government even referred to the DSR
as "an agency of the Commonwealth of Puerto Rico" in its own
*Amended Complaint*. (Docket No. 6 at 5). For this reason, the
Government may not bring a FCA claim against the DSR.

---

[9] For this reason, the Court will not address whether it may consider the unsworn
declaration provided by Defendants in support of their *Motion to Dismiss*.
(Docket No. 21-1).

Lastly, it is well established that "a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself." <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989) (citations omitted). Thus, the Government may not bring a FCA claim against Quiñones in his official capacity either.

### D. Eleventh Amendment

Having determined that the Government may not pursue a FCA action against Defendants, the Court declines to reach the question of whether Defendants are entitled to Eleventh Amendment immunity from suit. *See* <u>Stevens</u>, 529 U.S. at 779-80 (determining that the statutory question of whether a state agency can be sued under the FCA should be addressed prior to the Eleventh Amendment immunity question).

### V.   CONCLUSION

For the foregoing reasons, Defendants' *Motion to Dismiss* at Docket No. 21 is **GRANTED.** Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of May 2022.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge